UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BETTINA SCOTT,<br>Plaintiff,<br><br>v.<br><br>SCOTT G. ROSENTHAL,<br>CHARTERED FINANCE AND REALTY CORP.,<br>BAYVIEW FINANCIAL TRADING GROUP, LP,<br>FIRST UNION NATIONAL BANK and<br>INTERBAY FUNDING, L.L.C.,<br>KATHLEEN M. HAYES,<br>MARK D. HAYES a/k/a MICHAEL HAYES,<br>Defendants. | 1:04-CV-10855-RWZ |

OPPOSITION OF THE DEFENDANTS
BAYVIEW FINANCIAL TRADING GROUP, LP,
FIRST UNION NATIONAL BANK
and INTERBAY FUNDING LLC
TO THE PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

I.      Introduction.

Now come the Defendants BayView Financial Trading Group LP ("BayView"), First Union National Bank as Indenture Trustee ("First Union")[1] and Interbay Funding LLC ("Interbay") and respectfully oppose the Plaintiff, Bettina Scott's, Motion for Injunctive Relief (the "Motion to Enjoin").[2] Specifically, the Plaintiff seeks to enjoin BayView, First Union and Interbay from "assigning, selling, transferring or otherwise encumbering [the] mortgage/note secured by property held in the names of Kathleen M.

---

[1] First Union is now known as Wachovia Bank, N.A.

[2] While the Plaintiff does not appear to have advanced a new motion for injunctive relief, her Emergency Motion for a Temporary Restraining Order was granted by the Bristol Superior Court on or about March 28, 2004 and again by this Court on or about May 6, 2004 (the "TRO"). Thus, presumably, she is seeking to have it converted to a preliminary injunction, lest it lapse on its own.

Hayes and Mark D. Hayes and located at 21 Industry Court, Seekonk, Bristol County, Massachusetts." The reason for the Motion to Enjoin, according to the Plaintiff, is that Defendant Chartered Finance and Realty Corp. assigned the note and mortgage with the intent of defrauding her. Simply put, the Plaintiff is wrong. When the elements for injunctive relief are considered, she absolutely fails to establish entitlement to injunctive relief.

II.   **Factual and Procedural Background.**

### The New York Case

At the core of this case is a dispute between an ex-girlfriend and her ex-boyfriend. On or about March 26, 1997, the Plaintiff brought suit against her ex-boyfriend, the Defendant Scott Rosenthal ("Rosenthal") and his wholly-owned company, the Defendant Chartered Finance and Realty Corp. ("Chartered"), in the United States District Court for the Southern District of New York (the "New York Case"). (A true and accurate copy of the docket report, an August 24, 2001 Memorandum of Decision, and the December 6, 2002 appellate decision, all from the New York Case, are attached hereto as Exhibit A.) The Plaintiff's claims in the New York Case sounded in, amongst other things, quantum meruit. Ultimately, on or about March 28, 2001, the Plaintiff secured a judgment in the New York Case against Chartered and Rosenthal in the amount of $400,000. *See* Verified Complaint. She is trying to collect on that judgment, which is what gives rise to this instant case.

### The Loan

Completely unrelated to the New York Case, on or about June 9, 2000, Defendants Kathleen M. Hayes and Mark D. Hayes (together, the "Hayes") executed and

delivered to Chartered a note in the original amount of $655,000.00 (the "Note") to evidence a refinance loan in that amount (the "Loan"). To secure their obligations under the Note, on or about June 9, 2000, the Hayes also executed and delivered to Chartered a Mortgage and Security Agreement (the "Mortgage") on property at 21 Industry Court, Seekonk, Bristol County, Massachusetts (the "Property"). (True and accurate copies of the Note and Mortgage are attached hereto as Exhibit B and Exhibit C, respectively.) In addition to the Mortgage, the Hayes executed various other documents to secure their obligations under the Note, including but not limited to, an Assignment of Leases and Rents. (A true and accurate copy of the Assignment of Leases and Rents is attached hereto as Exhibit D.) Further, the Hayes' lessees at the Property executed Lease Subordination Agreements, whereby their respective leases were subordinated to the Mortgage. (True and accurate copies of the Lease Subordination Agreements are attached hereto as Exhibit E.)[3]

On or shortly after the day of the Loan closing, the Loan Documents were assigned to First Union. (A true and accurate copy of the Assignment of Mortgage/Deed of Trust, the Assignment of Other Loan Documents, and the Assignment of Assignment of Leases and Rents (collectively, the "Assignments") are attached hereto as Exhibit F.) Although the Assignments were executed in June 2000, they were not recorded until on or about April 3, 2001.[4]

---

[3] The Note, the Mortgage, the Assignment of Leases and Rents, the Lease Subordination Agreements, and the other documents securing the Hayes' obligations under the Note are collectively referred to as the "Loan Documents."

[4] Recording assignments long after they are executed is not unusual and, in fact, is the industry practice as opposed to the exception.

### *BayView Underwrote the Loan,*
### *First Union Owns the Loan*
### *and Interbay Services the Loan*

Although Chartered is named on the Note and Mortgage, Chartered did not actually loan any money. *See* Affidavit of Richard Pietrykowski, submitted herewith. Rather, the $655,000 loan proceeds came from BayView. *See id.* Immediately after the Loan was funded, it was assigned to First Union, and Interbay is servicing the Loan. *See id.*[5]

It is common practice in the lending industry for an entity to originate a loan, be named on the loan documents, have the funding for the loan come from another source, and have the loan documents immediately assigned to another entity. *See id.* In such a case, the originator of the loan and the nominal mortgagee is known as a "correspondent lender." *See id.* The arrangement with Chartered as far as the Hayes' Loan is concerned presents such a situation whereby Chartered was a correspondent lender. *See id.* The funds for the Hayes' Loan came from BayView, not Chartered, even though Chartered was named on the Loan Documents.[6] *See id.*

### *The Documents Corroborate that Chartered*
### *Was Simply a Correspondent Lender and BayView was Funding the Loan*

The documents relative to the Hayes' Loan show that Chartered was simply a correspondent lender, while BayView underwrote and funded the Loan. For example, as early as October 1, 1999, Chartered submitted a Loan Request Form to BayView, seeking

---

[5] M&T Mortgage Corporation was servicing the loan, but in light of the fact that the loan is now subject to litigation, it is now being serviced by Interbay. *See* Affidavit of Richard Pietrykowski.

[6] Having worked with Chartered, the Plaintiff knew, or at least should have known, that Chartered was simply a correspondent lender, at least as far as the Hayes' Loan was concerned. *See* New York Case decision.

{00052283.DOC}                                    4

funding for the Hayes' Loan. (A true and accurate copy of the Loan Request Form is attached hereto as Exhibit G.) In the Loan Request Form, Chartered is listed as the "Originator," and BayView is underwriting the Loan.

Thereafter, on or about June 1, 2000, BayView sent an escrow letter (the "Escrow Letter") to Chartered, to Peter Brooks (counsel for the Hayes) and to Marsh Moriarty Ontell & Dacey, P.C. ("Marsh Moriarty") (the closing/escrow agent). (A true and accurate copy of the Escrow Letter is attached hereto as Exhibit H.) In the Escrow Letter, BayView stated as follows:

> BayView . . . will be purchasing the above-referenced loan (the "Loan"). The Loan is being purchased from . . . [Chartered] . . . for a purchase price equal to 100% of the unpaid principal balance of the Loan.
>
> * * *
>
> BayView . . . will provide funding for the purchase of the Loan by wire transfer of the Purchase Proceeds in immediately available funds.
>
> * * *
>
> [Chartered] hereby represents and warrants that it is the legal and equitable owner and holder of the Loan, free and clear of all liens. Effective upon wire transfer of the Purchase Proceeds in accordance with the wire transfer instructions provided herein, [Chartered] acknowledges that it shall have been paid in full for the Loan and that it shall have no further ownership interest in the Loan.

Escrow Letter, pp. 1-2.[7]

Then, consistent with the Escrow Letter, BayView wired $655,000.00 to Marsh Moriarty on or about June 14, 2000. (A true and accurate copy of Marsh Moriarty's redacted Client Conveyancing Account Statement is attached hereto as Exhibit I.) Thereafter, Marsh Moriarty distributed the Loan Proceeds. (A true and accurate copy of Marsh Moriarty's Client Funds Checks statement is attached hereto as Exhibit J.)

---

[7] Consistent with the Escrow Letter is a February 11, 2000 letter agreement from BayView to Chartered offering to purchase the Loan. (A true and accurate copy of the February 11, 2000 letter is attached, behind the Escrow Letter, at Exhibit H.)

Notably, the Marsh Moriarty's Client Funds Checks statement shows that Chartered received $35,800. *See id.*

The HUD-1 from the closing is consistent. The HUD-1 shows that all that Chartered received was a "loan origination fee" of six percent, or $39,300. (A true and accurate copy of the HUD-1 is attached hereto as Exhibit K.) And, as reflected in Marsh Moriarty's Client Funds Checks statement, Chartered received $35,800 on or about June 19, 2000. (The difference between the $39,300 as listed on the HUD-1 and the $35,800 that was sent to Chartered appears to reflect, at least partially, funds that Chartered retained as part of the Hayes' deposit.) (A true and accurate copy of the 6/19/00 letter from Marsh Moriarty to Chartered enclosing the $35,800 is attached hereto as Exhibit L.)

Also consistent with the Escrow Letter, on or about June 19, 2000, Marsh Moriarty forwarded to BayView a check payable to BayView for "interest in advance" on the Hayes' Loan and a check payable to Interbay for "hazard insurance escrow" and "real estate tax escrow" for the Hayes' Loan. (A true and accurate copy of the 6/19/00 letter from Marsh Moriarty to BayView is attached hereto as Exhibit M.)

### *The Documents Corroborate that Interbay was Servicing the Loan*

In a letter dated June 5, 2000 (four days before the loan closed), Interbay sent a First Payment Letter with payment coupons to the Hayes, introducing itself as the servicer of the Loan. (A true and accurate copy of the First Payment Letter is attached hereto as Exhibit N.)

### *Plaintiff's Claims*

Now, Plaintiff has sued because, according to her, the assignment of the Loan Documents from Chartered to First Union constituted a fraudulent conveyance designed

to defraud her, since she is a judgment creditor against Chartered and Rosenthal. *See* Verified Complaint. She points to the timing of the Assignments as the basis for her claim, even though the Assignments occurred when the Loan closed, in or about June 2000, at which time she was not a judgment creditor against Chartered and Rosenthal; in fact, the New York Case was merely at the summary judgment stage at that point. *See* New York Case docket report.

III. **Argument.**

To establish entitlement to preliminary injunctive relief, the Plaintiff must demonstrate that there is a substantial likelihood that she will succeed on the merits of her claims, that she will suffer irreparable harm absent the granting of preliminary injunctive relief, that the threatened injury to her outweighs the threatened harm to the Defendants by the granting of the requested relief, and that the public interest will not be dis-served by the granting of the injunctive relief. See Smith and Zobel, Rules Practice, 8A Massachusetts Practice Series 65.4 (West 1981).

In practice, this "involves a combined evaluation of the moving party's claim of injury and its chance of success on the merits." Westinghouse Broadcasting Co. v. New England Patriots Football Club, Inc., 10 Mass. App. 70, 71, 496 N.E.2d 399, 400 (1980). The issue is not merely one of probability of success on the merits but a weighing of the respective threatened harms in light of the respective chances of success on the merits. Packaging Indus. Group v. Cheney, 380 Mass. 609, 617, 405 N.E.2d 106, 112 (1980).

For the reasons set forth below, BayView, First Union and Interbay submit that there is no likelihood that the Plaintiff will prevail on the merits of her claims. Further, there is no chance that the Plaintiff will suffer irreparable harm absent the granting of preliminary

injunctive relief. Finally, policy favors denying the Plaintiff's requested relief. Therefore, the requested preliminary injunctive relief should be denied by this Court.

### A. The Plaintiff Has No Likelihood Of Success On The Merits In This Action.

The Plaintiff has advanced two claims. One is to reach and apply the Loan Documents because, according to her, Chartered's assignment of the Loan Documents was fraudulent and designed to defraud her. *See* Verified Complaint, Count I. The other claim is pursuant to Mass. General Laws chapter 109A, the Uniform Fraudulent Transfer Act ("Chapter 109A"), whereby the Plaintiff asserts that Chartered's assignment of the Loan Documents rendered Chartered insolvent and was done in bad faith to defraud her. *See* Verified Complaint, Count II. The Plaintiff will not be able to establish either claim.

#### 1. The Plaintiff Cannot Establish a Fraudulent Transfer.

The current version[8] of Chapter 109A sets forth the basic test for a fraudulent transfer, as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (i)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

---

[8] The Uniform Fraudulent Conveyance Act ("UFCA") was replaced by the Uniform Fraudulent Transfer Act ("UFTA") in 1997, although it remained in M.G.L. ch. 109A. In re Rauh, 119 F.3d 46, 48 n.2 (1st Cir. 1997). Therefore, many of the cases cited below were actually decided under the UFCA rather than the (current) UFTA. Not surprisingly, the main factors to consider are the same under both.

       were unreasonably small in relation to the business or transaction; or

   (ii) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

M.G.L. ch. 109A §5(a). Subsection 5(b) then lists eleven relevant factors, including insider status; value of consideration; whether the debtor was insolvent at the time; the timing of the transfer ("shortly before or shortly after a substantial debt was incurred"); and whether the transfer "was of substantially all the debtor's assets."

  The caselaw, under the older UFCA is consistent: A conveyance is fraudulent where:

  (1) The debtor was insolvent at the time;
  (2) Where the transfer/conveyance was not for "fair" consideration or was without consideration; and
  (3) Where the conveyance was made "with the intent to hinder, delay or defraud" the debtor's creditor(s).

See, e.g., In re Rauh, 164 B.R. 419, 422 (Bankr.D.Mass. 1994), aff'd, 119 F.3d 46 (1st Cir. 1997); In re O'Brien, 190 B.R. 1, 3 (Bankr.D.Mass. 1995). It is the burden of the party claiming fraudulent transfer to prove these factors. In re Rauh, 164 B.R. at 422.

  Here, there is no suggestion that Chartered assigned the Loan Documents with actual intent to hinder, delay or defraud the Plaintiff. In fact, at the time that the Loan Documents were assigned (which is the same time as when the Loan closed), the New York Case was merely at the summary judgment stage; it was not as if the $400,000 verdict had been rendered against Chartered.[9]

---

[9] The Plaintiff tries to make something of the fact that the Assignments were not recorded until April 2001, five days after the verdict in the New York Case. But the date of recording the Assignments is irrelevant since recording an assignment (or any loan document for that matter) does not affect that document's validity.

Further, there is no suggestion that Chartered failed to receive a reasonably equivalent value for the assignment of the Loan Documents. In fact, it was not Chartered's money that funded the Loan, but rather BayView's. Chartered was merely a correspondent lender, and it never technically owned the Loan, nor was it ever intended that Chartered would own the Loan. All that Chartered earned relative to the Loan was $39,300 as an origination/broker's fee.[10]

Thus, the Plaintiff will not be able to show that Chartered fraudulently conveyed its rights to the Loan or the Loan Documents.

    **2.**    **The Plaintiff's Reach and Apply Claim Must Also Fail.**

Since the Plaintiff will not be able to establish a fraudulent transfer claim pursuant to Chapter 109A, her claim to Reach and Apply the Mortgage must also fail.

**B.**    **The Plaintiff Will Not Suffer Irreparable Harm Sufficient To Justify The Issuance Of Preliminary Injunctive Relief.**

A party requesting a preliminary injunction must also demonstrate the existence of irreparable harm, and that the harm to it will outweigh any harm to the party enjoined. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617, 405 N.E.2d 106 (1980). Money damages do not constitute the type of irreparable harm necessary for the issuance of injunctive relief.

The Plaintiff has failed to establish (or even allege for that matter) that she will suffer irreparable harm absent the granting of injunctive relief. Rather, all that she is claiming is money damages, in the form of collecting on the judgment from the New York Case. Should she ultimately prevail on her fraudulent transfer claim (which, of course, the

---

[10] Thus, neither the Loan nor the Loan Documents were ever even an asset of Chartered.

Defendants suggest is extremely unlikely), and should she somehow secure a judgment against BayView, First Union and Interbay, those entities are sufficiently solvent to satisfy a judgment.[11]

### C. Equities and Policy Militates in Favor of Denying the Plaintiff's Request for Injunctive Relief.

BayView, First Union and Interbay did nothing wrong. What occurred in this case is common in the lending industry. Chartered, as a correspondent lender, brokered the Hayes' Loan. BayView underwrote and funded it. The deal allowed the Hayes to refinance. Policy encourages such transactions.

The Plaintiff is trying to tie up the assets and activities of innocent parties. She has a dispute with her ex-boyfriend, Rosenthal, and she should not be allowed to drag BayView, First Union and Interbay into it. Should the injunction issue, in the future, BayView, First Union and Interbay, when presented with a loan transaction like the one in this case, will hesitate to underwrite and fund a loan with a correspondent lender for fear that a creditor of that correspondent lender will be able to enjoin all activities relative to the loan documents (and potentially reach and apply the loan documents).

### VI. Conclusion

The Plaintiff has failed to satisfy the criteria for the issuance of injunction relief. Accordingly, this Court should deny the Plaintiff's Motion to Enjoin.

---

[11] Even if they were not, inability to pay (or to collect on a judgment) is not a sufficient reason for injunctive relief. Otherwise, an injunction would be equivalent to a prejudgment attachment.

BAYVIEW FINANCIAL TRADING GROUP, LP,
FIRST UNION NATIONAL BANK and
INTERBAY FUNDING, L.L.C.

By their attorneys,

/s/ David C. Russman
Paul Michienzie, Esq. – BBO #548701
David P. Russman, Esq. – BBO #567796
Michienzie & Sawin LLC
745 Boylston Street, 5th Floor
Boston, MA 02116
Tel: 617-227-5660

Dated: 5/14/04

## CERTIFICATE OF SERVICE

I, David P. Russman, counsel for BayView Financial Trading Group, LP; First Union National Bank; and Interbay Funding LLC, hereby certify that I served a copy of the *OPPOSITION OF THE DEFENDANTS BAYVIEW FINANCIAL TRADING GROUP, LP, FIRST UNION NATIONAL BANK and INTERBAY FUNDING LLC TO THE PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF* upon the following by HAND on May 14, 2004:

Marc E. Chapdelaine, Esq.
George O. Gregson, P.C.
325 Central Street
Saugus, MA  01906

Todd McGrath, Esq.
Seyfarth Shaw
Two Seaport Lane
Boston, MA  02210

Jordan Shapiro, Esq.
Shapiro & Hender
640 Main Street
P.O. Box 392
Malden, MA  02148

And upon the following by FACSIMILE on May 13, 2004:

Marc E. Chapdelaine, Esq.
George O. Gregson, P.C.
325 Central Street
Saugus, MA  01906

_/s/ David P. Russman_
David P. Russman

Case 1:04-cv-10855-RWZ    Document 5    Filed 05/14/2004    Page 14 of 16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 MAY 14  A 9:25

U.S. DISTRICT COURT
DISTRICT OF MASS

BETTINA SCOTT, )
   Plaintiff, )
)
v. )
)
SCOTT G. ROSENTHAL, )
CHARTERED FINANCE AND REALTY CORP., )
BAYVIEW FINANCIAL TRADING GROUP, LP, )
FIRST UNION NATIONAL BANK and ) 1:04-CV-10855-RWZ
INTERBAY FUNDING, L.L.C., )
KATHLEEN M. HAYES, )
MARK D. HAYES a/k/a MICHAEL HAYES, )
   Defendants. )

## AFFIDAVIT OF RICHARD PIETRYKOWSKI

I, Richard Pietrykowski, do hereby depose and state as follows:

1. I am currently employed by Bayview Financial Trading Group, L.P., as its Assistant Vice President of Operations.

2. I make this affidavit upon my own personal knowledge, and I am submitting it in support of the *Opposition of the Defendants BayView Financial Trading Group, LP ("BayView"), First Union National Bank ("First Union") and Interbay Funding, LLC ("Interbay") to the Plaintiff's Motion for Injunctive Relief.*

3. As far as the June 9, 2000 loan to the Defendants Kathleen M. Hayes and Mark D. Hayes (together, the "Hayes"), which is the subject of this litigation, is concerned (the "Loan"), Defendant Chartered Finance and Realty Corporation ("Chartered") did not actually loan any money, even though Chartered is named on the Note and Mortgage.

{00053125.DOC}

4.   The $655,000 loan proceeds came from BayView. Immediately after the Loan was funded, it was assigned to First Union, and Interbay is servicing the Loan. M&T Mortgage Corporation was servicing the loan, but in light of the fact that the Loan is now subject to litigation, it is now being serviced by Interbay.

5.   It is common practice in the lending industry for an entity to originate a loan, be named on the loan documents, have the funding for the loan come from another source, and have the loan documents immediately assigned to another entity. In such a case, the originator of the loan and the nominal mortgagee is known as a "correspondent lender."

6.   The arrangement with Chartered as far as the Hayes' Loan is concerned presents such a situation whereby Chartered was a correspondent lender. Again, the funds for the Hayes' Loan came from BayView, not Chartered, even though Chartered was named on the Loan Documents.

Signed and sworn under the pains and penalties of perjury this 13th day of May, 2004.

_____
Richard Pietrykowski

{00053125.DOC}